# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-41164

United States Court of Appeals
Fifth Circuit

**FILED**

July 19, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ALL FUNDS ON DEPOSIT AT SUN SECURED ADVANTAGE, ACCOUNT
NUMBER *3748, Held at the Bank of NT Butterfield & Son Limited in
Bermuda

Defendant

ERICK SILVA SANTOS,

Claimant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, SMITH, and GRAVES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge.

Erick Silva Santos ("Silva"), a Mexican citizen, faces a federal indictment charging money laundering and fraud that he allegedly committed in connection with his tenure as mayor of Matamoros, Tamaulipas, Mexico. Silva had various assets in the United States and Mexico. After his federal indictment, he took flight and has not returned to this country. The Government subsequently filed this civil forfeiture proceeding, seeking certain

Case: 16-41164     Document: 00514079974     Page: 2     Date Filed: 07/19/2017

No. 16-41164

of Silva's assets that were allegedly tied to his conduct as a corrupt Mexican official. The district court ordered fugitive disentitlement under 28 U.S.C. § 2466 and subsequently entered final default judgment and order of forfeiture. Silva challenges these orders. We AFFIRM the fugitive disentitlement order and DISMISS Silva's appeal of the default judgment of forfeiture.

## I.

## A.

In July 2014, Silva was indicted by a federal grand jury and charged with money laundering conspiracy, aiding and abetting bank fraud, aiding and abetting mail fraud, and wire fraud. Silva has not returned to the United States since his indictment, and an active warrant exists for his arrest.

In November 2014, the Government filed a verified complaint for civil forfeiture *in rem*, seeking the forfeiture of a residence in Brownsville, Texas, and all funds in Silva's Bermuda bank account ("Bermuda account"). Both were allegedly tied to Silva's misappropriated campaign contributions and kickbacks from municipal contracts.[1] The Government published public notice

---

[1] Specifically, the complaint alleged that Silva:

served as mayor of Matamoros from 2008 through 2010, during which time his salary in U.S. dollars was about $100,000. In January 2003, he and [Maria] Castaneda Torres opened a joint savings account at JP Morgan Chase Bank in Brownsville, Texas ("joint savings account"). Prior to Silva's mayoral campaign in 2007, the average monthly balance in this account was approximately $15,000. At the end of May 2007, the balance was $6,439.42. From the time Silva took office in January 2008 until the account was closed in October 2008, $1,545,288 was deposited in the account. Plaintiff alleges that the increase "was because of deposits and transfers of (1) financial contributions received by Silva in return for the award of municipal contracts, (2) unlawful kickbacks from municipal contracts, and (3) unlawful proceeds from the approval of false invoices for municipal contracts all resulting in the illicit enrichment of Silva, the newly elected mayor of Matamoros." During Silva's time as mayor, the joint savings account funded an annuity in an offshore Bermuda account ("annuity account"), which accumulated a balance of $1,615,000. On July 16, 2008, Silva and his brother . . . opened an account in the name Aceros Industriales de

of the forfeiture proceeding for at least thirty days.  Notice was also sent to the known claimants, Silva and Maria Castaneda Torres ("Castaneda"). Castaneda is Silva's alleged common law wife.

Silva filed claims to the Bermuda account and Brownsville residence. Castaneda only filed a claim to the Brownsville residence.  At the expiration of the time for filing, no other claim or answer was filed.

In July 2015, the district court held an initial pretrial conference for the civil forfeiture action, at which time it learned that Silva was a fugitive in the criminal proceeding.  The court then set the civil case for trial.

Shortly thereafter, Silva and Castaneda moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), contending that the Government's complaint did not sufficiently identify underlying violations of Mexican law that would authorize civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A), (B), or (C).  Instead of responding to this motion, the Government, *inter alia*, moved for a finding of fugitive disentitlement as to

---

Matamoros S.A. de C.V. at JP Morgan Chase Bank in Brownsville, Texas ("Aceros account"). In August 2008, the Aceros account received foreign exchange credits of Mexican pesos to U.S. dollars via nine wire transfers totaling $791,855.76. Plaintiff alleges that bank records indicate that the Aceros entity was not incorporated in Mexico until June 2008, just one month before opening the account, and that the entity did not legitimately earn the money deposited in the account. On August 6, 2009, Silva and Castaneda Torres transferred $1,691,472.15 from the annuity account to the Aceros account. On September 30, 2009, Silva wire transferred $2.4 million from the Aceros account to the Sun Secured Advantage, Account Number *3748, at the Bank of NT Butterfield & Son Ltd., in Bermuda ("Sun Secured Advantage account"). . . . [O]n September 30, 2010, Silva withdrew $183,730.46 from . . . [a bank] account in Brownsville, Texas, [where he had deposited money from Mexican companies that had been awarded municipal contracts for projects he knew did not exist] for the purchase of the defendant real property located at 57 Creekbend Drive, Brownsville, Texas, in Castaneda's name. . . . Plaintiff now seeks forfeiture of the [defendant properties], which were allegedly obtained through "[t]he improper award of municipal contracts, false invoicing of municipal contracts, and the kickbacks Silva received" . . . .

No. 16-41164

Silva and, on that basis, further moved to strike Silva's claim, answer, and request for relief under Rule 12(c).

The district court granted the Government's motions as to Silva and ordered the Government to respond to Castaneda's request for Rule 12(c) relief. The Government responded to Castaneda's Rule 12(c) motion by specifying Silva's alleged violations of Mexican law. With the court's permission, it also amended its complaint to allege that Silva violated four provisions of the Tamaulipas Penal Code.[2] The court then mooted Castaneda's 12(c) motion to dismiss. The Government subsequently non-suited its claim for the Brownsville home, which left the Bermuda account as the only remaining defendant in the forfeiture action and Silva—now a disentitled fugitive—as the only claimant.

Silva filed a motion for reconsideration of the order granting fugitive disentitlement. But the district court denied Silva's motion. The Government then moved for entry of default judgment of forfeiture as to all funds in the Bermuda account. Because there were no further claims against that account, the district court ordered the clerk of court to enter default against the account and against any known or unknown potential claimants to it. The district court then granted the Government's motion for final default judgment and order of forfeiture pursuant to Rule 55(b).

---

[2] The Government identified the following provisions: (1) Article 216 (accepting bribes "in exchange for doing—or refraining from doing—any action related to [his] role as a public servant"); (2) Article 417 (fraud, consisting of "deception . . . resulting in an improper benefit or profit for him or others involved," and causing "a loss to the public funds of the municipality"); (3) Article 226 ("abusive exercise of functions," accomplished by "award[ing] public work contracts to companies that made campaign contributions with disregard of the bidding process and municipal policy"); and (4) Article 230 ("illicit enrichment," committed when "a public servant . . . cannot demonstrate the legitimate augmentation of his assets or the legitimate origin of the properties under his name, or those not under his name but for which he conducts himself as the owner").

4

No. 16-41164

B.

Silva has timely appealed. He concedes that the statutory requirements for fugitive disentitlement had been met. Silva contends, however, that the district court abused its discretion by applying disentitlement based on the mere allegations of the complaint before the Government submitted evidence in support of forfeiture. The district court erred, Silva argues, because: (1) the Government's complaint is wholly predicated on his alleged violations of Mexican law, yet the only evidence before the court—the official Mexican documents he submitted[3]—unambiguously indicate that, in Mexico's view, he did not violate Mexican laws; (2) given these documents, disentitlement prior to the Government's submission of evidence runs counter to principles of international comity; and (3) the act of state doctrine counsels against disentitlement here because the exonerative Mexican documents implicate the act of state doctrine. Furthermore, Silva argues, the district court erred in entering a default judgment under Rule 55 because: (1) no rule of civil

---

[3] Silva presented five sets of documents: (1) a certification from the State Elections Institute of Tamaulipas, Municipal Elections Council of Matamoros, stating that Silva "obtained the election victory" in November 2007, which allegedly "reflect[ed] that the resources used during his electoral campaign were transparent and were used in adherence with the electoral code, because had there been issues or wrongdoing with the campaign funds, the document and position would have been denied to Silva"; (2) a series of "decrees" issued by the State Congress of Tamaulipas twice a year from 2008 to 2010 that reflected approval of the public account of Matamoros during Silva's time as mayor, which purportedly demonstrated that that "there were not any irregularities found with the manner of which the public funds were handled and all legal requirements in using the public funds were met"; (3) a document entitled "Opinion about Fiscal Obligations Compliance" that was issued by the Mexican Secretary of Income and Public Credit/System of Revenue Administration, which allegedly showed that Silva's "tax returns are current and in good standing and no taxes are pending"; (4) two certifications from the Attorney General of Tamaulipas, the most recent dated February 2015, which state that Silva has no criminal record in the local jurisdiction; and (5) a certification from the Attorney General of Tamaulipas, dated January 2016, stating that "there are no criminal processes pending [against Silva] for the crimes of bribery contemplated in Article 216; Abusive Exercise of Power, Article 226; Embezzlement, Article 230; and Fraud, Article 417, typified in the current Criminal Code of the State of Tamaulipas."

procedure or statutory provision authorizes default judgment in this context; and, (2) alternatively, default judgment is not appropriate on these facts.

## II.

This Court reviews the district court's fugitive disentitlement order for an abuse of discretion. *Bagwell v. Dretke*, 376 F.3d 408, 413 (5th Cir. 2004). "[D]eference . . . is the hallmark of abuse-of-discretion review." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) (citation omitted). Nevertheless, "[a] district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Allen v. C & H Distribs., L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015) (citations omitted).

This Court also "review[s] the entry of a default judgment for abuse of discretion," although "even a slight abuse of discretion may justify reversal." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 495–96 (5th Cir. 2015) (citations omitted). "'[F]actual determinations underlying th[e] decision,'" however, "are reviewed for clear error.'" *Id.* at 495 (citations omitted). And questions of law are reviewed *de novo. See Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620 (5th Cir. 2014) (citation omitted).

## A.

We begin by addressing the threshold—and primary—issue in this appeal: whether the district court abused its discretion in ordering fugitive disentitlement.

Where, as here, a court finds that the statutory requirements for fugitive disentitlement have been met, the court may impose disentitlement, which "disallow[s] a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action." 28 U.S.C. § 2466(a). Even if, however, the statutory requirements for fugitive disentitlement have been satisfied, "§ 2466 does not mandate disentitlement;

the ultimate decision whether to order disentitlement in a particular case rests in the sound discretion of the district court." *Collazos v. United States*, 368 F.3d 190, 198 (2d Cir. 2004); *accord, e.g.*, *United States v. Batato*, 833 F.3d 413, 428 (4th Cir. 2016) ("Section 2466 leaves the application of disentitlement to the court's discretion, *see* § 2466(a) (using 'may' instead of 'shall')").

Here, Silva's appeal, with or without its trimmings, is limited to contesting whether the district court abused its discretion by choosing to apply disentitlement in his case.  The court erred in applying disentitlement, he argues, because: (1) the record evidence before the court—the Mexican documents—exonerated Silva; and (2) it follows that principles of international comity and the act of state doctrine also require reversal of the district court.[4]

1.

The foundation of each of these arguments is that the district court misinterpreted the Mexican documents—documents that Silva claims expressly and unambiguously exonerate him of the charged conduct.  We therefore begin by addressing the district court's holdings with respect to the Mexican documents.

In denying reconsideration of its order granting fugitive disentitlement, the district court made several findings with respect to the Mexican documents.  First, the court held, "the text of the first two sets of documents does not 'unambiguously' allow for the inference" that Silva did not violate Mexican law as charged.  Second, the court held, "evidence that Silva has paid his taxes, has no criminal record, and is not the subject of a criminal

---

[4] The Government contends that, as a disentitled fugitive, Silva is barred from challenging forfeiture on *any* grounds, so he cannot challenge the disentitlement order.  We disagree.  This argument incorrectly assumes that disentitlement, once ordered by the district court, is final and a bar to further benefit of the law, including an appeal.  *See, e.g.*, *Collazos*, 368 F.3d at 198.  The Government cites, and we can find, nothing indicating that a court's exercise of discretion in finding disentitlement itself is immune from appeal.

investigation or prosecution of any of the alleged Tamaulipas Penal Code violations does not foreclose the possibility that he engaged in conduct that would constitute such a violation." Finally, the court held, "Silva's evidence does not, . . . demonstrate an official exoneration; it merely reflects the absence of 'criminal processes' against him for the offenses serving as the predicate for civil forfeiture in this case."

As amplified at oral argument, Silva contends that the district court erred in this interpretation of the Mexican documents because, together, the documents expressly and unambiguously "tell[] us that the Mexican legal authorities have looked at Mr. Silva," have "determined that he . . . has not committed a crime in connection with his time as mayor," and are not currently investigating him for the charged crimes. According to counsel, these conclusions are based on documents that state: Silva met all of the election requirements in his mayoral campaign, his campaign was transparent, he did not misuse public funds, his public accounts as mayor contained no irregularities, he filed tax returns, he does not have a criminal record, he does not have any pending charges against him, and there are no open investigations of him.

Silva's interpretive gloss on the documents fails to demonstrate error by the district court. In distilled words, these documents state only that: (1) Silva won his mayoral election; (2) "[t]he public account of the City of Matamoros" was approved twice a year for the three years Silva was mayor; (3) as of December 2014 and based "exclusively [on] verification of having the declarations presented without considering if the amounts due are correct," Silva's tax returns were "current and in good standing" and Silva did not have any pending unpaid taxes; and (4) searches of "the electronic systems and/or archives of" the Attorney General's Office of the State of Tamaulipas in October 2012, February 2015, and January 2016 reflected that (a) Silva did not have

any criminal record in the local jurisdiction and that (b) as of January 6, 2016, "no criminal processes [were] pending [against Silva] for the crimes of bribery contemplated in Article 216; Abusive Exercise of Power, Article 226; Embezzlement, Article 230; and Fraud, Article 417, typified in the current Criminal Code of the State of Tamaulipas." These documents are general in relevant substance, obviously conclusory, and open-ended with respect to answers relating to the charged conduct. They certainly fall far short of demonstrating that the charged violations of Mexican law have been investigated and decided favorably to Silva. To be sure, as counsel conceded at oral argument, the most pertinent of these documents—those from the attorney general's office—do not reflect a determination of any kind; they only reflect the observation that Silva has not been charged with or convicted of the alleged violations of Mexican law. The district court did not err in its interpretation of the documents—that is, that they do not expressly and unambiguously provide a basis for concluding that the instant charges have been presented to and resolved by any official act of government in Mexico.

2.

Given this holding—that, on the record before us, no authority of Mexico has ever exonerated Silva of the criminal conduct alleged in the federal indictment—we have no occasion further to address Silva's additional arguments asserting the principles of international comity[5] and the act of state doctrine.[6] This is true because each of these arguments requires us to find that

---

[5] "Under the principles of international comity, United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries . . . ." *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). As explained above, with respect to the charges of the federal indictment, there are no relevant acts or proceedings pending in Mexico.

[6] Under the act of state doctrine, courts will "decline to decide the merits of the case if in doing so [they] would need to judge the validity of the public acts of a sovereign state

the Mexican officials exonerated, at least to some extent, Silva of the conduct charged in the federal indictment. Because we have concluded that the district court did not abuse its discretion in holding that the Mexican documents were not exonerative, we AFFIRM the district court's fugitive disentitlement order.

### B.

We will, however, turn briefly to Silva's argument that the district court erred in entering its default judgment of forfeiture. Silva argues that the district court's default judgment must be set aside because: (1) no rule or statute authorizes it in this context; and (2) default judgment is not appropriate on these facts.

As we noted earlier, fugitive disentitlement "disallow[s] a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action." 28 U.S.C. § 2466(a). As recited in this opinion, a disentitlement order was entered by the district court, which Silva appealed. We have allowed the appeal for the purposes of determining the propriety of that disentitlement order. We have, moments earlier above, validated Silva's disentitlement and effectively declared that Silva is disallowed from using the resources of the United States in furtherance of his claims in this appeal. Consequently, Silva is barred from using the resources of this Court in furtherance of his claim.[7] *See United States v. 2005 Pilatus*

---

performed within its own territory." *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985) (citations omitted). Here, there are no public acts of Mexico at issue in this appeal.

[7] This sanction is justified by both concerns about enforceability and the fact that dismissal here "serves an important deterrent function and advances an interest in efficient, dignified appellate practice." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 242 (1993) (noting that where an appellant "is a fugitive during 'the ongoing appellate process,'" the Supreme Court has "consistently and unequivocally approve[d] dismissal as an appropriate sanction," finding that such sanctions are "amply supported by a number of justifications"— namely, "enforceability concerns" and the fact that "dismissal by an appellate court after a defendant has fled its jurisdiction serves an important deterrent function and advances an interest in efficient, dignified appellate practice" (citations omitted)).

No. 16-41164

*Aircraft, Bearing Tail No. N679PE*, 838 F.3d 662, 663 (5th Cir. 2016); *Bagwell*, 376 F.3d at 410. Thus, we need not address any further issues Silva pursues to save his property in this civil forfeiture proceeding.

## III.

For the foregoing reasons, we AFFIRM the district court's fugitive disentitlement order and DISMISS Silva's appeal of the default judgment of forfeiture.

AFFIRMED in part;

DISMISSED in part.